**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **RUSSELL ADKINS, M.D.,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **5:04-CV-80 (WDO)** |
| | : | |
| **THE HOSPITAL AUTHORITY OF** | : | |
| **HOUSTON COUNTY, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## ORDER

Dr. Russell Adkins brought this case alleging that his hospital privileges at Houston Medical Center were suspended because of his race, African-American. He sued the hospital, numerous doctors, the Hospital Administrator and the governing authority of the hospital, the Hospital Authority of Houston County, asserting claims pursuant to 42 U.S.C. §1981, §1983 and §1985(3) as well as various state law claims. As to the §1983 claims, Dr. Adkins contends that (1) the Defendants violated his right to equal protection by summarily suspending and not renewing his privileges based on his race and (2) the Defendants took these actions without affording him due process. The §1981 claims are that the Defendants discriminated against Dr. Adkins in the making, performance and enforcement of his contractual relationship with his patients. The §1985 claims are that the Defendants conspired to deprive Dr. Adkins of various constitutional rights. Defendants filed motions to dismiss arguing that Dr. Adkins failed to state a claim on which relief can be granted and on the basis of qualified immunity. The Court declined to rule on the motion to dismiss and instead ordered the parties to engage in discovery and thereafter file motions for summary

1

judgment.  After an extensive discovery period, the Defendants have now moved for summary judgment.  After carefully considering the entire record, the Court finds that another hearing is unnecessary and makes the following findings.

The Medical Executive Committee of Houston Medical Center is the representative body for the hospital's medical staff and consists of officers of the medical staff and the Chairmen of the various departments.  One of the MEC's duties is to review the qualifications, credentials, performance, professional competence and character of applicants and staff members and make recommendations to the Hospital Authority regarding staff appointments, clinical privileges and corrective actions.  The Hospital Authority independently reviews the physicians' files and makes independent decisions regarding whether to approve or deny the MEC's recommendations.  Pursuant to the Bylaws, "The Hospital Authority may affirm, modify or reverse the prior decision or, in its discretion, refer the matter back to the Medical Executive Committee for further review and recommendation within ten (10) business days.  Such referral may include a request that the Medical Executive Committee arrange for a further hearing to resolve specified issues."[1]  The MEC may summarily suspend a physician when it feels action must be taken immediately to protect the health or safety of patients.

Pursuant to the hospital's bylaws, each Department in the hospital is an autonomous unit that formulates its own policies and procedures and has its own Department Chair.  The Chair of each Department examines the licensure, character, professional competence, qualifications and ethical standing of physicians applying for privileges within that Department.  The Departments, as much as is practical, are autonomous units coordinating their efforts through the Medical Executive

---

[1]Art. XII, Sec. H, ¶ 8.

Committee and other Committees of the Staff as necessary for administrative functioning. Each Department establishes criteria for the granting of Clinical Privileges within the Department and submits recommendations regarding the specific Clinical Privileges each Staff Member or Applicant may exercise. Each Department adopts a written Departmental code containing rules and regulations that are reviewed, amended and approved by each Department. The Department of Surgery is listed as a separate department that did in fact adopt its own Rules and Regulations.

In 1997, Dr. Adkins applied for provisional medical staff membership in the Department of Surgery at Houston Medical Center. The application was approved subject to the standard provisions that he consult with another surgeon on the first 25 patients admitted to the hospital and be observed by another surgeon on the first 10 surgeries performed at the hospital. In early 1998, the Hospital Authority approved Dr. Adkins' application for provisional active staff membership. During the provisional period, Dr. Adkins experienced problems with being available for call, following preadmission protocol and completing his medical records on time. For instance, the hospital required patients who were undergoing surgical procedures to have consents and blood work done prior to the day of surgery. However, Dr. Adkins would not require his patients to follow these rules which would result in his patients' surgeries and the schedule for the entire Department of Surgery being delayed and the need for additional staff. When Dr. Adkins later applied to change from a provisional status to active status, the MEC recommended that the Hospital Authority extend Dr. Adkins' provisional status for 6 months to monitor his performance in following preadmission protocol. In 1999, the Hospital Authority extended his provisional status for 6 months so he could be monitored on preadmission protocol, timely completion of medical records and availability for and timely response to calls from the hospital. At the end of the provisional period, Dr. Adkins'

status changed to "active" membership.

In June of 2001, Dr. Harvey, the Chief of Staff at the time, was contacted by Outpatient Surgery when no one was able to reach Dr. Adkins regarding one of his surgical patients who was experiencing complications in the recovery room.  Dr. Harvey beeped Dr. Adkins and received no response.  Dr. Harvey then contacted Dr. Adkins' office and learned that Dr. Adkins had left the call area without arranging for anyone to cover for him.  Dr. Adkins contends his pager was not working properly at the time.  Following an investigation, Dr. Adkins received a letter of admonishment regarding his unavailability.

In late 2001, Dr. Adkins submitted his application for reappointment.  The Credentials Committee determined that (1) Dr. Adkins' attendance at medical staff meetings fell below the 50% required by the Bylaws, (2) Dr. Adkins continued to have problems being available for calls and (3) Dr. Adkins had multiple suspensions for failure to timely complete his medical records. As a result, his reappointment was granted with the stipulations that he attend 100% of his meetings for 6 months and that his medical charts would be monitored for 6 months.

In March of 2002, Dr. Adkins posted a surgical case on the bulletin board for a 7-month-old male patient to perform an open procedure to repair an obstruction in the infant's kidney that was diagnosed in January of 2002.  The anesthesiologist who reviewed the posting informed Dr. Adkins that such a procedure was not appropriate at Houston Medical Center because it is not a pediatric facility and is not properly equipped to handle any complications which could arise.  Rather than transferring the child to another facility, which was an option considering the matter was not an emergency, Dr. Adkins removed the posting from the schedule and proceeded to perform a closed procedure of placing a stint in the child's kidney.  Because of complications that arose during the

surgery, Dr. Adkins was unable to perform the surgery and, rather than transferring the child to another facility, ordered the nurse to procure an adult uretaoscope and adult male dialotors.  When the nurse questioned Dr. Adkins about using adult male instruments on the infant, Dr. Adkins ordered her to do as she was told because the infant's penis is a "muscle that would stretch."  Dr. Adkins used the adult instruments to manipulate the child's urethra but lost the stint inside the child before it could be placed.  Dr. Adkins eventually retrieved the stint and placed it.  Following this procedure, internal complaints were made by the operating room personnel to the Department of Surgery and an investigation ensued.

Dr. Alford, the Medical Director and a Defendant in this case, conducted the investigation. He interviewed the personnel involved in the surgery and attempted to interview Dr. Adkins but Dr. Adkins refused to discuss the matter after he was informed that Dr. Alford intended to tape-record the interview, as he had done in all the other interviews.   After Dr. Alford completed the investigation, he submitted the transcribed witnesses' statements and the pertinent medical records to the Performance Improvement Committee ("PIC").  The PIC sent the matter out for two external peer reviews that resulted in the following findings:

- the procedure was not emergent;

- Dr. Adkins' decision to perform the procedure was inappropriate as the procedure of choice for an infant male in that situation rarely requires temporary drainage but requires a procedure that would avoid trauma to the infant's lower urinary tract;

- there were concerns regarding the management of the infant and not being able to confirm adequate instruments were available before the procedure began;

- the dilation of the urethra and distal ureter in a male infant was inappropriate even

though the outcome may not be immediately apparent; and

• potential future problems for the baby include permanent disability with recurrent stricture, incontinence, urinary tract infections, renal insufficiency and the need for multiple corrective surgeries.

From these findings, the external peer reviewers concluded that (1) the documentation did not support the need for surgery, (2) the diagnosis was confirmed, (3) the surgical technique was not appropriate, (4) the procedure was not appropriate, (5) the medical judgment was not appropriate and (6) there was an error in judgment and technique. The Department of Surgery submitted the reports to the Credentials Committee. Those reports along with those of the PIC were sent to the MEC. The MEC thereafter invited Dr. Adkins to meet with them to discuss the findings. Dr. Adkins met with the MEC and, following that meeting, the MEC restricted Dr. Adkins, as well as the other two urologists at the hospital, from performing any future complex pediatric cases at the hospital unless they were cleared by the Department Chairman.

A few months later, the PIC received a complaint from a female patient regarding another surgery performed by Dr. Adkins. Because the patient returned to surgery within 31 days of admission the case triggered a Departmental peer review, as the record shows happened with any patient who presented to the hospital within 31 days of a previous admission. The case was referred to the PIC. After the initial complaint, the patient also filed a complaint with the Joint Commission for Healthcare Accreditation Organization ("JCHAO"). The JCHAO requested a response from the hospital pursuant to which the MEC formed an Ad Hoc committee to investigate the matter.

As a result of the investigation, the hospital learned that Dr. Adkins had performed a bladder sling and a rectocele procedure on the patient on June 24, 2003. Three weeks after the procedure,

6

the patient was still experiencing bleeding and eventually noticed surgical gauze hanging out of her vagina.  Upon discovering the gauze, the patient went to Dr. Adkins' office where he examined her and determined that he needed to oversew the incision area because the gauze was grafting material he had used during the surgery.[2]  The following morning, the patient awoke covered in a pool of blood and realized she was bleeding profusely from her vagina.  The patient's husband took her to the emergency room and informed the doctors that Dr. Adkins had operated on her three weeks previously and had seen her the day before to repair the incision area.  Because the patient was in horrible pain, she refused to allow the emergency personnel to examine her and Dr. Adkins was contacted.  The patient requested to speak with Dr. Adkins on the telephone and when she did Dr. Adkins told her he was out of own and that she needed to allow the emergency room physician to examine her.  Dr. Adkins admitted in his discovery responses that he was in fact more than 30 miles from the hospital on that date.  The emergency personnel attempted to examine the patient again and she refused due to the extreme pain so Dr. Adkins was contacted again.  Over the phone, Dr. Adkins admitted the patient and ordered pain medication for her.  However, he did not inform any hospital personnel that he was out of town or that he had asked Dr. Deighton to cover for him, although Dr. Deighton was informed he needed to cover for Dr. Adkins beginning on Saturday and the patient came into the emergency room on Thursday.  Later in the afternoon, the nursing staff contacted Dr. Adkins regarding the patient's bleeding and continual complaints of pain.  Dr. McBride, the surgeon on call, was contacted, evaluated the patient and contacted Dr. Deighton to examine the patient as her problem was urological.  Three hours later, Dr. Adkins finally arrived at the hospital and

---

[2]The patient stated that, during this visit, Dr. Adkins informed her he was going to Detroit the next day but Dr. Adkins denies he told her he was going out of town.  The patient also testified that Dr. Adkins has since tried to convince her he never told her he was going to Detroit but the two could never agree on what was said.  R. at 173, Ex. A., pp. 129, 267.

reported to the operating room where Dr. Deighton was about to begin operating on the patient.  Dr. Deighton offered to turn the matter over to Dr. Adkins but Dr. Adkins asked Dr. Deighton to proceed with the surgery because he was already scrubbed and ready.  After the surgery, Dr. Deighton replaced Dr. Adkins as the patient's physician.

After conducting the investigation into the complaints regarding the female patient, the PIC made the following findings:

- in violation of the Bylaws, Dr. Adkins admitted a patient when he could not respond appropriately and failed to inform the hospital that anyone was covering for him;

- Dr. Adkins failed to timely complete the patient's medical records as her June 24-27, 2003 admission was not dictated until September 9, 2003;

- there was an extreme discrepancy in the amount of blood loss reported by the anesthesiologists and indicated by Dr. Adkins in the medical records;

- Dr. Adkins operated on a patient and left town without arranging for appropriate coverage;

- the external peer review had also noted problems with the medical records, the discrepancy in the blood loss reported, the lack of follow-up care after surgery and the lack of any note in the medical record regarding the July 16 admission;

- there were reports that Dr. Adkins discussed the patient's care with her husband in the hallway where other individuals could overhear the conversation; and

- all of the aforementioned issues demonstrated a lack of professional judgment.

In September of 2003, the MEC recommended renewal of Dr. Adkins' privileges with warnings regarding his timeliness of completing reports and his availability.  He was notified that

his patients would be monitored by another physician for 6 months.  The Hospital Authority rejected the limited renewal recommendation and requested the MEC to reconsider its recommendation after receiving the final report regarding Dr. Adkins' treatment of the female patient.  At the October 6, 2003 meeting, the MEC voted to suspend Dr. Adkins for 60 days, the reasons given for which were that the suspension was in furtherance of quality healthcare and to protect the health and safety of patients at the hospital.  The MEC also recommended that the Hospital Authority deny Dr. Adkins' application for reappointment.  Dr. Adkins was informed of the adverse action and advised of his hearing rights.  Dr. Adkins declined, in writing, to attend or otherwise participate in the hearing. On March 22, 2004, the Hearing Committee recommended denying Dr. Adkins' application for reappointment.  After reviewing the recommendation, the MEC voted to summarily suspend Dr. Adkins for 60 days and recommended that the Hospital Authority deny Dr. Adkins' application.  The Hospital Authority accepted the recommendation and Dr. Adkins' privileges were suspended.

After Dr. Adkins filed this suit against the Defendants and the parties began to engage in discovery, serious issues arose regarding the scope and relevance of the discovery sought by Dr. Adkins.  After several hearings and orders, the Court eventually ordered Defendants to produce discovery related only to events that occurred within 5 years of Plaintiff's termination, from May 26, 1999 to May 26, 2004, and only on those individuals who were "similarly situated" to Dr. Adkins, as explained more thoroughly below.  Defendants produced redacted information to Plaintiff regarding the incidents that occurred with other physicians who were disciplined in some way and produced Dr. Adkins' peer reviews.  The actual peer reviews and credentialing files of the other physicians were produced to the Court for an in camera review and covered periods of time far

beyond that ordered by the Court.[3]  Based on the foregoing factual findings and a thorough examination of the peer review material submitted in camera, the Court makes the following legal findings.

### Qualified Immunity

Defendants raised the defense of quality immunity.  That is, Defendants claim that Dr. Adkins failed to allege a custom, policy or practice of the hospital that was the moving force of any constitutional violation and failed to show that the individual Defendants violated any of Dr. Adkins' clearly established constitutional rights.  The Hospital Authority and the individual Defendants are "state actors" pursuant to Faucher v. Rodziewicz, 891 F.2d 864, 868 (11th Cir. 1990). Although the individual Defendants argue that some of them should not have been sued because they did not attend certain meetings or attended and abstained from voting at the meetings, for purposes of this order the Court finds they were all "government actors."

"Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  Monell v. Department of Social Services, 436 U.S. 658, 690, 98 S. Ct. 2018 (1978).  Courts may not hold a party, such as the hospital in this case, liable solely under a theory of respondent superior.  Id. at 691.  The threshold inquiry a court must undertake in a qualified immunity analysis is whether a plaintiff's allegations, if true, establish a constitutional violation. Hope v. Pelzer, 536 U.S. 730, 736, 122 S. Ct. 2508, 153 L. Ed.2d 666 (2002) (citing Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed.2d 272 (2001)).  If no constitutional right was

---

[3]Those documents will remain with the Court until 60 days after judgment is entered.

violated, "there is no necessity for further inquiries concerning qualified immunity." <u>Saucier</u>, 533 U.S. at 201.  The qualified immunity defense "embodies an 'objective reasonableness' standard, giving a government agent the benefit of the doubt," provided that the conduct was not "so obviously illegal in the light of then-existing law. <u>Crosby v. Paulk</u>, 187 F.3d 1339, 1344 (11th Cir. 1999) (quoting <u>GJR Invs., Inc. v. County of Escambia</u>, 132 F.3d 1359, 1366 (11th Cir. 1998)).  The circumstances that confronted the government actor must have been so "materially similar" to prior precedent that it constituted clearly established law because "public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases." <u>Id</u>. (citations omitted). "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." <u>Id</u>.

Generally, in analyzing §1981 and §1983 claims, courts follow the same burden-shifting framework used in Title VII cases. <u>Standard v. A.B.E.L. Services, Inc.</u>, 161 F.3d 1318 (11th Cir. 1998) (Title VII and 42 U.S.C. §1981 and §1983 have the same requirements of proof and use the same analytical framework.); <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed.2d 668 (1973).  However, Dr. Adkins' §1981 claims must be dismissed because §1983 is the exclusive federal remedy for alleged §1981 violations when the claim is pressed against a state actor. <u>Jett v. Dallas Independent School Dist.</u>, 491 U.S. 701, 735 (1989); <u>Butts v. County of Volusia</u>, 222 F.3d 891, 894 (11th Cir. 2000) (Civil Rights Act of 1991 did not affect the continuing validity of <u>Jett</u>).  Finally, because public officials cannot raise a qualified immunity defense to a §1985(3) claim, that claim is addressed separately below.  <u>Burrell v. Board of Trustees of Ga. Military College</u>, 970 F.2d 785, 794 (11th Cir. 1992).

The threshold inquiry this Court must undertake is whether Dr. Adkins' allegations, if true, establish a constitutional violation.  If he has not shown that any of his constitutional rights were violated, there is no necessity for further inquiries concerning qualified immunity and the Court must grant summary judgment in favor of Defendants.  Since the qualified immunity defense embodies an objective reasonableness standard, the Court must give the Defendants the benefit of the doubt, provided that Dr. Adkins' termination was not obviously illegal in light of then-existing employment discrimination law.

"Direct evidence of discrimination is evidence, that, 'if believed, proves the existence of a fact in issue without inference or presumption.'"  Vickers v. Federal Express Corp., 132 F. Supp.2d 1371, 1378 (S.D. Fla. 2000) ("Racially derogatory statements can be direct evidence if the comments were (1) made by the decisionmaker responsible for the alleged discriminatory act and (2) made in the context of the challenged decision.") (quoting Burrell v. Board of Trustees of Ga. Military College, 125 F.3d 1390, 1393 (11th Cir.1997)).  Such evidence is generally comprised of specific statements, conduct or attitudes by employment decision makers that reflect a bias or discriminatory animus toward a particular protected class.  Dr. Adkins presented no evidence of any statements or other conduct by the Defendants that indicated Dr. Adkins was suspended because he is an African-American nor is there any evidence in the record that could be construed as direct evidence of discrimination.

"Where direct evidence of discrimination is absent, a plaintiff establishes a circumstantial, prima facie case of racial discrimination based on disparate treatment by showing several things: (1) he belongs to a racial minority; (2) he was subjected to [an] adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was

qualified to do the job."  Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316 (11th Cir. 2003) (citing Holifield v. Reno, 115 F.3d 1555, 1561-62 (11th Cir. 1997) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973))).  Dr. Adkins satisfied the first, second and fourth prongs of a prima facie case.  What the court must determine is whether Dr. Adkins was suspended or disciplined for conduct that similarly situated, non-African-American physicians were not.

Although Dr. Adkins concedes he had a continuing problem completing his medical records on time, he contends other physicians had the same problems and that he handled his surgical cases in the manner he thought was appropriate at the time.  However, the record shows that the entire time he was employed at the hospital he continually violated the written policies and procedures as alleged by the Defendants.  What is important is that these events were documented in the record but even if the events did not actually occur, they can be considered if the decision-makers honestly believed they occurred.  Knight, 330 F.3d at 1318 n.6 (citing Jones v. Gerwens, 874 F.2d 1534, 1540 (11th Cir.1989) ("The law is clear that, even if a Title VII claimant did not in fact commit the violation, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation.")).  An employer's legitimate, nondiscriminatory reason, even if based on a mistaken belief, will not subject an employer to liability if that belief is subsequently proven to be an incorrect one.  Moore v. Sears, Roebuck & Co., 683 F.2d 1321, 1323 n.4 (11th Cir. 1982) (the court "need only determine that the defendant in good faith believed plaintiff's performance to be unsatisfactory") (citations omitted).  An employer has a right to interpret its rules as it chooses and to make determinations as it sees fit under those rules because the anti-discrimination statutes only prohibit *discrimination*.  Nix v. WLCY Radio/Rahall

Communications, 738 F.2d 1181, 1187 (11th Cir. 1984) (citation omitted).

The Eleventh Circuit Court of Appeals has admonished, "federal courts do not sit as a super-personnel department that reexamines an entity's business decisions.  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [courts do] not interfere.  Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior."  Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000) (citation omitted).  Federal courts "are not in the business of adjudging whether employment decisions are prudent or fair."  Id. (citation omitted).  "An 'employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'"  Id. (citing Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir.1984)).  Often mistaken for more than what it is, most plaintiffs fail to comprehend that the anti-discrimination statutes are not federal civility codes.  Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).  Those laws simply do not extend to every action that makes an employee or former employee unhappy.  Davis v. Town of Lake Park, 245 F.3d 1232, 1242 (11th Cir. 2001).  Therefore, Dr. Adkins cannot prove discrimination by allegations of unfairness or showing he disagreed with the Defendants' interpretation of the hospital's rules.  Dr. Adkins must show he was *discriminated against* because of his race by being suspended for similar or comparable conduct for which non-African-American physicians were not.

In Holifield v. Reno, the Eleventh Circuit addressed a case where an African-American physician sued the Bureau of Prisons after he was removed from his position at the Federal Correctional Institution in Marianna, Florida.  Holifield v. Reno, 115 F.3d 1555 (11th Cir. 1997).  In its analysis of the plaintiff's claims, the court noted that a "plaintiff must show that his employer

treated similarly situated employees outside his classification more favorably than [him]self."  Id. at 1562 (citation omitted).   "To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects."  Id. (citations omitted).  In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.  Id. (citations omitted).

The court compared the actions taken against the plaintiff to those taken against other physicians at the facility, "[r]ecognizing, however, that these are only a limited number of potential 'similarly situated employees' when higher level supervisory positions for medical doctors are involved."  Id. at 1563.  The court distinguished the two comparators on the conduct complained of and found their conduct legally distinguishable.  In response to the plaintiff's claim that other staff members "felt racism played a part in decisionmaking by the administration, and that not enough African-Americans were in positions of authority" at the facility, the court held that "the alleged biases of other staff members are not relevant.  The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case."  Id. at 1563 (citations omitted).

In Anderson v. WBMG-42, the court held that comparators were similarly situated when they "fell within the primary responsibility of one middle manager and the same supervisory chain of command."  Anderson v. WBMG-42, 253 F.3d 561, 566 (11th Cir. 2001).  However, the court rejected the defendants' broad assertion that "a plaintiff cannot prevail as a matter of law whenever two different supervisors are involved in disciplining the plaintiff and comparators."  Id.  The court

noted that the involvement of two or more supervisors is simply one consideration for the court to make in determining whether a plaintiff was similarly situated to the comparators.  Id.

The record clearly establishes that Dr. Adkins violated the various policies and procedures, written and unwritten, as alleged by the Defendants.  There is absolutely no evidence whatsoever in the record that any of the Defendants applied the policies in a discriminatory manner.  Dr. Adkins failed to identify a single similarly situated physician (surgeon, urologist or any other) who engaged in conduct comparable to that of Dr. Adkins, particularly considering the reprehensible conduct involving the surgery on the 7-month-old male patient.   Dr. Adkins failed to show that the decisionmakers involved in his case knew about the alleged instances of misconduct by the other physicians.  He failed to show that any of those individuals had their cases submitted to the same peer review panels or outside review boards.  The record clearly shows that the hospital closely managed concerns with patient care, failure to timely complete medical records and any other ways in which a physician may violate the bylaws.  For instance, one physician who had a case sent to peer review for various problems had a clearly distinguishable trait - the physician saw a problem during surgery and immediately ceased operating on the patient, rather than proceeding with a surgery knowing there could be serious consequences. The same physician had a patient experience problems with severe blood loss but the blood loss was related to another individual prescribing the wrong medication.  Another surgeon had a patient experience postoperative difficulties but the surgeon immediately responded to and remedied the problem.   Two other physicians were disciplined for unprofessional conduct for responding to a hospital call after consuming alcoholic beverages.  They were prohibited from serving in any elected office and from chairing any committees at the hospital.  Another physician was fined for withholding information from a

colleague's medical records.  The evidence clearly establishes that the hospital applies its bylaws and standards of conduct to all physicians who violate the same without regard to a physician's race.

Dr. Adkins was unable to give clear examples of non-African-American doctors being treated more favorably under similar circumstances.  His responses were: "I've known cases that were worse" and "I can't recall the names or whatever but I know for a fact."[4]  His attempt as explaining that response was "I just know I have been treated differently, okay?  That's the only thing I can tell you. . . .  I can't get into specific dates and specific cases, but I've understood from staff in the hospital certain things. . . .  I just know I'm treated differently.  Okay?  That's the best I can do."[5]  The only specific examples he gave at that time was where another physician's patient had come into the emergency room because of a gunshot wound.  Tragically, that patient died but Dr. Adkins failed to show how that particular doctor was treated more favorably in relation to any peer review of the issue.  Dr. Adkins also mentioned a case where another physician was accused of having sexual relations with one of his employees and abusing his prescription-writing privileges.  The hospital suspended the physician, as did the Composite State Board, for 90 days.  Dr. Adkins failed to point to any non-African-American physicians engaged in worse conduct than Dr. Adkins yet were not disciplined.  Rumors, conclusory allegations and a plaintiff's subjective beliefs about the conduct of allegedly "similarly situated" individuals "are wholly insufficient evidence to establish a claim of discrimination as a matter of law."  Mitchell v. Toledo Hosp., 964 F.2d 577 (6th Cir. 1992).

---

[4]Plf.'s Dep. at 108.

[5]Id. at 110-114.

One of Dr. Adkins' primary disagreements with the Defendants is the issue of his availability, or lack thereof, to attend to the matter with the female patient. Dr. Adkins maintains that he adequately cared for the patient and "told people" he would be out of town but that they could contact him. The practice of the hospital was that the physician himself is ultimately responsible for notifying the Emergency Room if he is going to be out of town. Further, when a physician is called by the ER about one of his patients with an emergency condition, if that physician did not want to or was unable to care for the patient, the physician must let the ER know another physician is covering for him, and identify who that other physician will be. Further, when a physician admits a patient into the hospital, that physician is designating himself as the individual who will provide the primary care for the patient. If that physician is unable to care for the patient it is his responsibility to inform the hospital if there is someone different who will be taking care of the patient post admission.[6] The record clearly shows that Dr. Adkins failed in every one of these responsibilities. He gave conflicting stories to his office and some individuals at the hospital regarding where he was going and when he was going out of town. Further, it was hours after the patient was readmitted to the hospital that Dr. Adkins finally arrived only to find that another physician had stepped in and taken care of Dr. Adkins' patient. Dr. Adkins cannot in light of the evidence before this Court deny that he failed in these responsibilities.

One important item of evidence is the list of physicians who in the last five years had their hospital privileges suspended at Houston Medical Center. That list shows the hospital evenly applies the rules to all physicians. The physicians who had been suspended were: 6 African-American, 32 Caucasian and 9 Asian, all for various types of offenses. Of course, there is not an

---

[6]R. at 159, p. 197-198 (Depo. of Dr. Deighton, Chief of Staff).

exactly equal number of physicians in those categories but the list is telling - the hospital has no

problem disciplining physicians whose race is something other than African-American.  The peer

reviews of the physicians show the Hospital Authority takes substandard patient care, failure to

attend to medical records and failure to be available for patients very seriously.   If a physician

violates the bylaws, or any other standard of care adopted by the various Departments, the Hospital

Authority will take appropriate action against that physician by an informal file review by the

Department Chair, a review by the MEC, PIC, an Ad Hoc Committee or a peer review Committee

or a combination of all of the above.

Dr. Adkins failed to establish any of the Defendants violated his constitutional rights in the

manner in which he was disciplined and eventually suspended.  Dr. Adkins failed to show that the

Hospital Authority adopted, approved or in any way implemented policies, customs, practices or

procedures that violated his constitutional rights.  This is not a case where a genuine issue of

material fact is created because of the subjective reasons given for the suspension of Dr. Adkins'

privileges.  Rather, the reasons given by the Defendants are based on written policies and procedures

that the respective individual Defendants believed Dr. Adkins violated in a manner that placed

patients at an increased risk of immediate and long-term harm.  Dr. Adkins' only response to the

Defendants' reasons for his suspension was that he believed what he did was sufficient in each case.

Dr. Adkins does not dispute that the Defendants believed he used bad judgment, acted

unprofessionally or violated the policies in question.  Dr. Adkins simply responds that he does not

feel that what he did showed bad judgment or unprofessional behavior or violated any hospital

policies.  This is not sufficient to defeat summary judgment in a case where the Defendants' opinion

of Dr. Adkins' performance is the relevant issue.  Although qualified immunity is determined under

objective reasonableness standards, the individual Defendants' subjective intent is an essential element of the underlying allegation of a Constitutional violation.  Defendants could not have violated Dr. Adkins' rights unless they had the intent to discriminate.  Defendants suspended Dr. Adkins because they reasonably believed he violated hospital policies in a manner that jeopardized his patients' health and the efficient running of the hospital.  These are lawful motivating factors. Because Dr. Adkins' suspension did not violate clearly established statutory or constitutional rights of which a reasonable person would have known, the Defendants are entitled to qualified immunity from Dr. Adkins' §1983 claims and to summary judgment in their favor.

### Remaining Claims

Dr. Adkins claimed due process violations although it is unclear exactly how he is claiming his due process rights were violated.  Any claim that Dr. Adkins is alleging is dismissed however because he failed to take advantage of the hearing process offered by the hospital and thoroughly explained to him in numerous letters from several different individuals.  Faucher, 891 F.2d at 870-871 (no due process claim where the plaintiff chose to address her grievances to a federal court rather than the hospital's appellate review procedures); Richards v. Emanuel County Hosp. Authority, 603 F. Supp. 81, 86 (S.D. Ga. 1984).

As to the §1985 claim, Dr. Adkins claims the Defendants conspired to discriminate against him in the ways alleged above.  The elements of a §1985 conspiracy claim are "(1) a conspiracy; (2) for the purpose of depriving, directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws; (3) an overt act in furtherance of the object of the conspiracy; and (4) that the plaintiff (a) was injured in his person or property, or (b) was deprived of having and exercising any right or privilege of a United States

citizen." Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986) (citations omitted) (no longer good for one point of law not relevant to the case at bar).  "The language of Section 1985 which requires an intent to deprive one of equal protection or equal privileges and immunities means that there must be some racial or otherwise class-based invidiously discriminatory animus behind the conspirators' action." Id. at 1007-08.  One of Dr. Adkins' examples of how the Defendants conspired against him is his allegation that Dr. Deighton was the driving force behind the female patient's complaint to the hospital and the JCHAO.  That patient's deposition testimony clearly refutes this allegation.  She stated that before she spoke to Dr. Deighton about her complaints regarding Dr. Adkins' care, during the time in which he was treating her after her final operation, she had already sent the initial complaint to the JCHAO.  Further, Dr. Deighton did not disparage Dr. Adkins' care to the patient as alleged by Dr. Adkins.  Rather, the patient testified that Dr. Deighton stated he was surprised to see an incision that large across her abdomen and that he would have done the procedure differently. When Dr. Adkins was asked in his deposition whether he felt any the other doctors were trying to take his patients, he responded, "I don't know."  In fact, Dr. Adkins was never able to articulate a basis for suing any of the individual Defendants other than that he thought they were all involved in some way in the suspension of his privileges, even those who abstained from voting or who were never present for a particular committee meeting.  Based on the findings related to the §1981 claims, Dr. Adkins failed to establish a "conspiracy" for the purpose of depriving him, directly or indirectly, of the equal protection of the laws, failed to point to any overt acts in furtherance of the object of any alleged conspiracy or that he was deprived of having and exercising any right or privilege of a United States citizen.  The §1985 claim is therefore dismissed.

***Conclusion***

Because the Court has dismissed all claims over which it has original jurisdiction, it declines to exercise supplemental jurisdiction over Dr. Adkins' state law claims, see 28 U.S.C. § 1367(c)(3), and those claims are dismissed without prejudice.  Defendants' motions to dismiss and motions for summary judgment are GRANTED and judgment shall be entered in the Defendants' favor.

**SO ORDERED this 2ⁿᵈ day of May, 2006.**


**S/**
**WILBUR D. OWENS, JR.**
**UNITED STATES DISTRICT JUDGE**